| | | |
|---|---|---|
| ALLISAH LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 03631 |
| | ) | |
| CITY OF CHICAGO, DAVID TENCZA, | ) | Judge Edmond E. Chang |
| JOHN LEE, NIYELL POWELL, APRIL | ) | |
| FISHER, IRIS HOUSTON, GLENN | ) | |
| DAVIS, MR. SUTTER, TERRANCE | ) | |
| MCMAHON, TERRANCE FAHEY, | ) | |
| JAMES MURRAY, MARTIN ANDERSON, | ) | |
| GLENN LANIER, JR., MR. CADDIGAN, | ) | |
| MR. WOODS, MS. URBON, | ) | |
| MR. ROBINSON, UNITED ROAD | ) | |
| TOWING, INC., and other UNNAMED | ) | |
| PERSONS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Allisah Love, proceeding *pro se*, brings constitutional and Illinois common-law claims against myriad Defendants: the City of Chicago; twelve Chicago Police Department (CPD) officers; United Road Towing, Inc., a private company that contracts with the City to operate an automobile impound lot; and three employees of the City's Office of Emergency Management and Communications (OEMC), where Love formerly worked. Underlying the claims are several incidents in which Love was allegedly falsely arrested, defamed, wrongfully fired, retaliated against, and otherwise subjected to a conspiracy to deprive her of constitutional and

statutory rights.[1] (This list is not exhaustive, as detailed below.) Defendants now move separately to dismiss the various claims under Federal Rule of Civil Procedure 12(b)(6). The motions are granted in large part and denied in part. The majority of Love's claims and many named Defendants are dismissed; only a narrow set of claims related to one of Love's arrests and detainments, which occurred in November 2007, will survive.

## I. Background

### A. Factual Allegations

In evaluating the motions to dismiss, Love's factual allegations must be accepted as true with reasonable inferences drawn in her favor. *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2079 (2011). For ease of reference, the allegations, which revolve around several discrete incidents related to Love's employment with the City and to separate altercations with the CPD that span years, are presented in chronological order. The complaint is voluminous and includes several tangents, but the operative facts are as follows.

### 1. Employment with OEMC

In March 1998, Love accepted employment with OEMC in the position of Police Operator I, which functions as a "police call taker." Third Am. Compl. ¶¶ 125, 126. Two years prior, Love had passed an examination to work as a police dispatcher, or Police Operator II. *Id.* ¶ 124. The different responsibilities required by the two positions are not clear, but Operator I provides for a pay grade below

_____

[1]Subject-matter jurisdiction is proper over the federal claims under 28 U.S.C. § 1331 and over the state-law claims under 28 U.S.C. § 1367(a).

that of Operator II. *Id.* ¶ 125. When Love began as an Operator I, she and other candidates who had previously passed the Operator II exam were told by the City that they would be moved into that higher-paying job once positions opened, before outside applicants were considered. *Id.*

Despite that representation, in June 1998, three months after Love started work, the City posted a job announcement for 32 Operator II positions, requiring that applicants have at least 18 months of experience in 911-dispatching, a condition Love did not meet. *Id.* ¶¶ 127-28. Love contends that the City intentionally engaged in a deceptive employment practice in filling Operator II slots in this manner and refusing to transition Love into the role despite further vacancies. *Id.* ¶ 129. Love complained to her union, but the complaint went nowhere. *Id.* ¶¶ 130-31.

According to Love, her union-inquiries and complaints about the hiring practices (it is unclear to whom exactly Love made these complaints) motivated the City to conspire to retaliate against her. *Id.* ¶ 134. To that end, between 1998 and 2000, Love received twelve disciplinary actions, ten of which, she says, were unfounded; among these was a 20-day suspension after Love allegedly handed in a broken handset, even though a log showed that fifteen other employees had turned in damaged handsets. *Id.* ¶ 136. Furthermore, during the course of 2000, Love made at least ten reports of supervisor harassment, none of which was ever addressed (no further details are provided about the nature of this harassment). *Id.* ¶ 138. In June of that year, Love also sought employment with the Los Angeles Police Department,

but alleges that her application was denied because the City of Chicago failed to pay her college tuition and gave negative feedback about her to the LAPD.[2] *Id*. ¶ 139. Finally, despite taking and passing the City's firefighter examination twice, the City never contacted her to follow up on employment.[3] *Id*. ¶ 140.

In particular, Love names three of her OEMC supervisors, Defendants James Murray, Martin Anderson, and Terrance Fahey, as among the participants in the City's conspiracy against her. *Id*. ¶ 137. In August 2000, Anderson, apparently in retaliation, demanded that Love resubmit paperwork related to her scheduled furlough. *Id*. ¶ 141. On December 10, 2000, Love reported an incident of harassment involving Murray (the underlying details of the harassment are not provided) to Fahey, evidently to no effect. *Id*. ¶ 142. That same day, Fahey refused Love's request to use sick leave, even though Love was ill, had plenty of hours she could use, and had followed standard procedures. *Id*. ¶¶ 142-43. Love was forced to leave work without authorization as a result and was later treated at a hospital (the nature of her illness is not described). *Id*. ¶¶ 143-44. When Love returned to work a few days later, she was suspended and, following a departmental review held "without proper notification" and where she was unrepresented by her union, OEMC terminated her employment on January 19, 2001. *Id*. ¶¶ 148, 150, 152. Love

---

[2]The basis of Love's suggestion that the City had an obligation to pay for her college tuition is unclear.

[3]Love also notes that in 1991 she took the City's examination to become a police officer but, "[v]ia another deceptive hiring practice, [she] was notified that she was disqualified for the position due to her 'psychological evaluation.'" Third Am. Compl. ¶ 123. Aside from this aside, Love does not appear to premise any of her claims on her failure to obtain employment as a CPD officer.

alleges that even after her firing, the City retaliated against her by contesting her claim for unemployment benefits, though those benefits were ultimately approved. *Id.* ¶¶ 155-56.

## 2. April 2001 Arrest at Restaurant

About three months after her firing, Love was arrested while attending a performance sponsored by a local radio station at a restaurant on the South Side of Chicago. *Id.* ¶¶ 158, 177. Love arrived at the event, held on April 2, 2001, but, demanded a refund of her money because she was dissatisfied that the venue had no seating. *Id.* ¶¶ 157-59. While Love was waiting for the restaurant manager to sort out her request, one of the event's security personnel told her that she had to leave, and then grabbed and shoved her, forcing her down a staircase. *Id.* ¶¶ 162-64. Evidently, CPD officers were already present outside; Love approached one to obtain the name of the man who had shoved her. *Id.* ¶ 165. This officer reported to Love, falsely, that the security man's name was Herman Jones and that he worked for the sheriff's department, when in fact he was a CPD officer, Defendant Glen Lanier, Jr. *Id.* ¶¶165-66. None of the other CPD officers on site, including Defendants Caddigan, David Woods, and Urbon, agreed to take the complaint Love wished to make against Lanier.[4] *Id.* ¶ 167.

After Love went to a local police station to file her complaint, she was directed back to the restaurant so that police could identify the security officer who had pushed her. *Id.* ¶ 170. After some confusion and a call to 911, Love was driven

---

[4]The third amended complaint does not specify the first names of these officers. The City's brief identifies Woods' first name as David. R. 280, City Defs.'s Br. at 1.

back to the restaurant, where Caddigan, Woods, and Urbon were still present, and she pointed Lanier out. *Id.* ¶¶ 171-76. After Lanier was questioned by the officers, however, it was Love who was placed under arrest. *Id.* ¶¶ 176-77. When asked why she was being arrested, Woods answered, "Disorderly conduct." *Id.* ¶ 177. When Love appeared for her hearing on the charge, the case was dismissed, because the State refused to prosecute. *Id.* ¶ 181. Love contends that Lanier, Caddigan, Woods, and Urbon filed a false police report against her to bring the disorderly conduct complaint, in retaliation of her pending complaints against the City (evidently, her accusations of unfair hiring practices at OEMC). *Id.* ¶ 180.

### 3. October 2007 Arrest of Love's Brother

The story picks up six years later. In late October 2007, Love's teenage brother (his name is Christopher Grooms), along with two other juveniles, were stopped and searched by CPD Officers David Tencza and John Lee (they are named as defendants). *Id.* ¶ 27. The teenagers were driving a car owned by Uylonda Henderson, the mother of one of the two boys riding with Grooms. *Id.* ¶ 30. Love alleges that, during the stop, one of the teenagers witnessed Tencza plant something in the car that Tencza and Lee claimed was drugs. *Id.* ¶ 34. Love's brother, and only he, was arrested for unlawful possession of a controlled substance, *id.* ¶ 35, and Henderson's car was impounded, *id.* ¶ 37. The felony charge was dismissed by a state court on November 13, 2007, however, after the State declined to prosecute following lab results that showed that the substance found (allegedly planted) in the car was not a controlled substance. *Id.* ¶¶ 53, 54.

### 4. November 2007 Arrest at Auto Pound

Meanwhile, at Henderson's request, Love assisted her in trying to get Henderson's car released by the City. Love spoke on Henderson's behalf at an administrative hearing regarding the impoundment. *Id.* ¶¶ 45, 49, 57. Love alleges that counsel for the City purposefully sought to dismiss the "administrative hearing case" so that the City would not have to produce the lab reports on the substance found in the car. *Id.* ¶ 60. After much expense and hardship to her family due to the lack of a car for nearly a month, Henderson won an order directing the City to return the impounded car, at no cost, on November 19, 2007. *Id.* ¶¶ 62, 63.

On November 20, Love and Grooms, along with Henderson and her son, went to pick up the car at a lot located on the South Side. *Id.* ¶ 68. Unfortunately, Henderson's car would not start after sitting idle for a month, even after a jump from one of the lot's employees. *Id.* ¶¶ 69, 70. Lot personnel refused to allow Henderson's son to bring his car into the lot, or to push Henderson's car outside, to try giving it a jump that way. *Id.* ¶ 72. Henderson and Love were instead told that they would have to pay for one of the pound's tow trucks to pull the car the thirty feet necessary to bring it outside of the lot. *Id.* ¶¶ 71, 73.

At that point, Love called 911 to report that the pound was refusing to let Henderson retrieve her car. *Id.* ¶ 74. Having spent two hours trying to get the pound to release the car, Love went to a trailer on the site in order to find and speak with a manager. *Id.* ¶¶ 75, 76. After she was ignored by two more employees inside the trailer, a security officer, later identified as Defendant Niyell Powell,

approached Love and pointed to a sign stating that only vehicle owners were allowed inside of the trailer. *Id.* ¶¶ 78, 79. Love demanded Powell's name, but he refused and said that he would get the manager. *Id.* ¶ 80. When Love asked again for his name, Powell responded, "Officer Muhammad." *Id.* ¶ 81. Love later discovered from one of the supervisors at the pound that Powell was an off-duty police officer who was contracted to work at the pound by a company called United Road Services. *Id.* ¶ 83. As Love left the trailer, Powell followed her. *Id.* ¶ 84. Love asked him twice if he was going to get a manager but Powell said nothing. *Id.* ¶ 85. Love informed Powell that if he did not get a manager, she would call the CPD and make a complaint. *Id.* ¶ 87. As Love then took out her phone to do so, Powell took his out as well and called 911. *Id.* ¶ 88. Love also called 911. *Id.* ¶ 90.

CPD Officers, Defendants April Fisher and Iris Houston, arrived and spoke with Powell. *Id.* ¶ 90. Another officer, Defendant Davis, then arrived and, without asking any questions or allowing Love to speak, ordered her to "[p]ut the phone down and put your hands behind your back." *Id.* ¶ 91. Fisher and Houston, neither of whom had spoken with Love since arriving to investigate, went ahead and handcuffed her, searched her, and placed her in the back of their squad car. *Id.* ¶ 92. Henderson, her son, and Grooms all repeatedly asked why Love was being arrested; after ignoring them, Davis finally responded, "He [Powell] wants her arrested, so she's being arrested." *Id.* ¶ 93. Davis ultimately informed Love that she was being arrested for trespassing. *Id.* ¶ 95. According to Love, Powell never told her to leave the property. *Id.* ¶ 96.

Love alleges that when she was taken to the police station, Defendant Officer Francis Sutter came into the room where she was being held and told Fisher and Houston to add additional charges to Love's rap sheet in order to increase her bond.[5] *Id.* ¶ 101. Sutter also told Love that the City's auto pound was "state supported property" and that he could "up" the charge. *Id.* ¶ 103. Fisher and Houston upgraded the charge to criminal trespassing and added a charge of resisting arrest. *Id.* ¶ 102. Defendant Terrance McMahon, identified as the Watch Commander, later entered the room and told the officers to add "attempt to defeat" to Love's charges. *Id.* ¶ 104. According to Love, Fisher and Houston joked in front of her that "people who do little or nothing get the book thrown at them, and the people who are hard core get off easy." *Id.* ¶ 105.

When Love's mother and Henderson arrived at the police station and inquired about Love's release, Fisher and Houston revealed to them that Love "'had been arrested before' and had 'a history' with the police department." *Id.* ¶ 111. Love *had* been arrested once before, during the 2001 incident at the restaurant. *Id.* ¶ 113. In Love's view, her arrest at the auto pound, along with the arrest of her brother in October 2007, was part of the City's "continuing conspiracy to retaliate against [her] and her family for past and current complaints made against the City, and its agents."[6] *Id.* ¶ 120.

---

[5]Sutter's first name was not identified by the third amended complaint. The City refers to him as Francis in its brief. City Defs.'s Br. at 1.

[6]Love alleges a further reason for the City's desire to retaliate against her family, namely that her father, a former CPD officer himself, had been a member of a class action lawsuit filed against the City for discriminatory hiring practices. Third Am. Compl. ¶ 122.

### 5. December 2013 Search

The final chapter to Love's story occurred another six years later. On the night of December 12, 2013, just after midnight, Defendant CPD Officer Robinson (no first name is provided) and another police officer showed up at the home where Love and her brother Grooms were staying and demanded entry. *Id*. ¶ 214. Robinson allegedly refused to show identification and claimed that an emergency call had originated from that location, stating that a pregnant woman was being beaten. *Id*. ¶ 215. Although Love informed the officers that there was no pregnant woman in the home, they continued to bang on the door, leading Love to call 911. *Id*. ¶ 216. The dispatcher with whom Love spoke confirmed that an emergency call had been made about the home, and Love allowed the officers into the home. *Id*. ¶¶ 217-18. Once in the residence, Robinson acted in an intimidating manner. *Id*. ¶ 218.

Love does not specify the outcome of the search of the home or how and when Robinson and the other officer left. She recounts only that she tried to lodge a complaint with the Independent Police Review Authority but was stymied because the City influences "policy in favor of protection [of] policy officers." *Id*. ¶ 225.

### B. Procedural History

Love filed the first complaint in this case on June 12, 2009. R. 2, Compl. She filed her third, currently operative amended complaint on November 14, 2014. *See* Third Am. Compl. In addition to the City of Chicago, it names a number of its employees as individual defendants, who can be divided into two main groups for

ease of reference. First, the various CPD Defendants: those officers involved in Love's 2001 arrest outside the restaurant (Lanier, Caddigan, Woods, and Urbon), those involved in Love's brother's 2007 arrest (Tencza and Lee), those involved in Love's 2007 arrest at the auto pound (Powell, Fisher, Houston, and Davis) and subsequent detention (Sutter and McMahon), and the one involved in 2013 home search (Robinson). Second, there are the OEMC managers (Fahey, Murray, and Anderson). However, because the latter two were never properly served with summons, the Court lacks personal jurisdiction to hear claims against them, leaving only Fahey in this category. *See* R. 346, Murray Summons Returned Unexecuted, Dec. 15, 2014; R. 375, Anderson Summons Returned Unexecuted, Mar. 24, 2015. The third amended complaint also named for the first time United Road Towing. Love's previous complaints had incorrectly named an entity called United Road Services, which was eventually dismissed from the case. *See* R. 360, Minute Entry dated Jan. 16, 2015.

Against this cast of Defendants, Love raises fifteen separate counts: Counts 1 and 2 allege false arrest and false imprisonment by the various CPD Officers involved in Love's arrests in 2001 and 2007 (with the exception of Sutter and McMahon); Count 3, defamation and public disclosure of private facts against Officers Fisher and Houston specifically for revealing her prior arrest to her mother and Henderson following Love's 2007 arrest; Count 4, malicious prosecution against the CPD Officers involved in Love's 2001 and 2007 arrests (except Sutter and McMahon); Count 5, a *Monell* claim against the City based on Love's continued

treatment by the CPD and OEMC; Counts 6 to 9, conspiracy by the CPD Defendants and Fahey to violate her constitutional rights under 42 U.S.C. §§ 1983, 1985, and 1986; Count 10, retaliation by the same individuals against Love for engaging in protected conduct; Count 11, wrongful termination/retaliatory discharge by Fahey and other unnamed persons; Count 12, breach of contract by the City in relation to her employment at OEMC; Count 13, intentional infliction of emotional distress by the CPD Defendants and Fahey; Count 14, indemnification by the City of any damages owed by the CPD Defendants and Fahey; and Count 15, which alleges that United Road Towing is liable under a theory of *respondeat superior* for the actions of its employee, Powell.[7] *See* Third Am. Compl. ¶¶ 243-330.

Three separate motions to dismiss are pending. The first was filed by the City on behalf of itself and the CPD Defendants—with the exception of Powell, who, although a CPD officer, was not on duty during his involvement with Love's 2007 arrest. R. 280, City Defs.'s Mot. Dismiss.[8] Powell, who has appeared *pro se*, moved to be allowed to join the City Defendants' motion and adopt its arguments, which the Court granted. *See* R. 316, Minute Entry dated Nov. 4, 2014. But Powell was

---

[7]The caption of the third amended complaint correctly names United Road Towing, Inc., but the relevant paragraphs in the body of the complaint continue to refer to the dismissed entity, United Road Services. *Compare* Third Am. Compl. at Caption *with id.* ¶¶ 12, 18, 330. Because Love's intent to name United Road Towing is clear, the Court construes the body of the third amended complaint to refer to that company and not the dismissed misnomer.

[8]Although Love's third amended complaint was filed after the City Defendants' motion to dismiss, which was made in reference to the prior operative complaint, the Court ordered that the motion be applied to the present complaint because the only change between the versions was the inclusion of the proper name of United Road Towing. *See* R. 338, Minute Entry dated Nov. 19, 2014.

explicitly warned that he was taking a risk by not advancing his own arguments, as the Court would apply the City Defendants' arguments only to the extent that they clearly applied to him. *Id*. The other two motions were filed by United Road Towing [R. 365] and Fahey [R. 355], who also adopted many of the arguments set forth by the City Defendants.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above

the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79. Unsupported conclusions of fact, moreover, need not be accepted as true. *See St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 633 (7th Cir. 2007).

## III. Discussion

The majority of Love's claims fail to state a claim upon which relief may be granted, even when given the "liberal construction" due the filings of a *pro se* plaintiff. *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Some of the claims must be dismissed because, on the face of the complaint, the claims were brought after the expiration of the statute of limitations. The only claims that do survive at this pleadings stage, and barely, are those arising out of Love's November 2007 auto-pound arrest. The Court addresses each of the counts in the third amended complaint in turn.

### A. False Arrest and False Imprisonment

Love raises claims for both false arrest and false imprisonment as a result of her 2001 and 2007 altercations with CPD, doing so via § 1983 as alleged violations of the Fourth Amendment's protections against unlawful seizures. Third Am. Compl. at Counts 1, 2. In light of her *pro se* status, the Court also construes the complaint broadly to assert false arrest and imprisonment claims under Illinois common law as well.

## 1. 2001 Claims

To begin, Love's claims related to her 2001 arrest outside the South Side restaurant—implicating Lanier, Caddigan, Woods, and Urbon—can be dismissed as untimely. Illinois applies a two-year limitations period to personal injury claims, like those for false arrest and imprisonment. *See* 735 ILCS 5/13-202. This same period applies for Love's federal claims because "in § 1983 actions, federal courts apply the statute of limitations governing personal injury actions in the state where the injury took place." *Serino v. Hensley*, 735 F.3d 588, 590 (7th Cir. 2013) (citing *Hondo, Inc. v. Sterling*, 21 F.3d 775, 778 (7th Cir. 1994)). State law supplies the time limit (two years), but federal law supplies the rule of decision for when the claim accrues, *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993): as pertinent here, a § 1983 action "begins to run 'at the time the claimant becomes detained pursuant to legal process'—that is, when the arrestee is bound over by a magistrate or arraigned on charges." *Serino*, 735 F.3d at 591 (quoting *Wallace v. Kato*, 549 U.S. 384, 397 (2007)).

"Although the statute of limitations is ordinarily an affirmative defense that must be pleaded under Fed. R. Civ. P. 8(c), a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred[.]" *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) (citing *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000)). Love's claims related to the 2001 arrest are indisputably time-barred. On the face of the pleadings, she was taken into custody in April 2001. Third Am. Compl. ¶¶ 157, 177. The complaint does not specify when she was "bound over by a magistrate,"

arraigned, or otherwise detained pursuant to legal process. But it does state that the charges were dropped in short order, and she was certainly released in 2001 (she relates that she was hired by a new employer in August of that year). *Id.* ¶¶ 181, 184. Love filed this action in 2009, eight years after her arrest and detention and, even without precise dates, about six years after the limitations period ran.[9]

### 2. 2007 Claims

The claims related to the November 2007 arrest—involving Powell, Fisher, Houston, and Davis—are a different matter. The City and CPD Defendants do not challenge their timeliness, instead arguing that Love cannot state a claim to relief because the allegations themselves show that the CPD Defendants had probable cause to arrest and detain her. City Defs.'s Br. at 7-9. Although it is a close call, this contention fails and the claims survive.

"A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law," someone who "misuse[s] power" while "clothed with the authority of state law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006) ("[A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office.") (citations

---

[9]Love argues that the 2001 arrest and detention were part of a "continuing tort," the conspiracy by City employees to retaliate against her, and that the limitations period therefore should run only with the last overt act in furtherance of that conspiracy, making these claims timely. R. 308, Pl.'s Resp. to City Defs. Br. at 2-3. This contention is without merit. Because, as discussed below, Love's claims of an overarching conspiracy by the City through the years are not plausibly pled, she has no basis to use them as a lifejacket to preserve her 2001 claims.

and internal quotation marks omitted).[10] Such a wrongdoer violates the Fourth Amendment, as well as Illinois provisions against false arrest and false imprisonment, where he seizes a person (as Love undoubtedly was) unreasonably, that is, without probable cause. *See Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 344 (7th Cir. 2010); *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009); *Boyd v. City of Chicago*, 880 N.E.2d 1033, 1044 (Ill. App. Ct. 2007) (citing *Reynolds v. Menard, Inc.*, 850 N.E.2d 831, 837 (Ill. App. Ct. 2006)). Probable cause exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (citations omitted).

The Court cannot say that, with all reasonable inferences drawn in her favor, Love has pled herself out of court on the issue of probable cause for the November 2007 arrest and detention. The City and CPD Defendants argue that the allegations show that the responding officers, Fisher, Houston, and Davis, correctly relied on Powell's complaint that Love was trespassing in the auto pound. City Defs.'s Br. at 7-8. It is true that, ordinarily, "[w]hen an officer has received his information from some person—normally the putative victim or an eyewitness—who it seems

---

[10]Powell was not on duty as a CPD officer during the relevant events. However, "[a] private actor … can have acted under color of law if the plaintiff can establish that '(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents.'" *Thurman*, 446 F.3d at 687 (quoting *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000)). Powell is implicated by Love's state-law claims as well, as "a private individual may be held liable for false arrest if the defendant goes beyond merely giving information and participates in making an arrest which turns out to be unlawful." *Olinger v. Doe*, 163 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (citations omitted).

reasonable to believe is telling the truth, he has probable cause to arrest the accused perpetrator." *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) (citations omitted) (giving example of supermarket guard who reports having seen a customer shoplift). But there is an important caveat: the police can rely solely on that victim "unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003). "An officer should pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009); *see also Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000) ("Police must act reasonably on the basis of what they know … [and] they can't close their eyes to [ ] additional information.").

As the pleadings tell it, Love entered the trailer at the auto pound to look for a manager but, when Powell silently pointed to the sign that only vehicle owners were allowed inside, Love left the trailer.[11] Third Am. Compl. ¶¶ 77, 79. Now on the grounds of the lot, a place of business presumably open to the public and not only to vehicle owners (Love and her companions had spent two hours on the site without issue while trying to get Henderson's car released), Love and Powell *both* called 911

---

[11]Illinois law makes it unlawful for a person to "knowingly and without lawful authority … remain[ ] within or on a building" or to "remain[ ] upon the land of another, after receiving notice from the owner or occupant to depart." 720 ILCS 5/21-3(a). However, the restriction does "not apply to being in a building which is open to the public while the building is open to the public during its normal hours of operation," nor to "a person who enters a public building under the reasonable belief that the building is still open to the public." *Id.*

to report a problem with the other. *Id.* ¶¶ 75, 88, 90. Not once did Powell tell Love to leave the property. *Id.* ¶ 96. Officers Fisher and Houston arrived first and proceeded to speak with, and only with, Powell. *Id.* ¶ 90. Officer Davis then arrived. *Id.* ¶ 91. It is unclear to which of the 911 calls, Love's or Powell's, the three officers were responding. But according to the complaint, Davis went (after he arrived at the lot) straight to Love, did not allow her to speak or ask her any questions, and placed her under arrest. *Id.*

On these facts, the false arrest claim remains in place, at least at this point. The key factual allegation is that none of the officers asked Love, or Grooms, Henderson, and her son, who had all been present, about what had happened. Not that the officers necessarily had to believe what Love and these witnesses would have said, but given the fact that the officers must have understood that Love and Powell had some form of conflict (both having called 911), the failure to even investigate further by speaking with Love could be deemed as unreasonable. With inferences made in the light most favorable to Love, these allegations plausibly suggest that the CPD officers arrested her, acting only and without question on their fellow officer Powell's (it can be inferred that Powell made his CPD-status known to the others, if they did not already know it) desire to be done with her efforts to get Henderson's car released. *See People v. Jardon,* 913 N.E.2d 171, 184 (Ill. App. Ct. 2009) (identifying witness's motive as one factor that should lead police to assess totality of circumstances rather than rely only on that witness's complaint). Remember that Davis justified detaining Love by tersely saying,

"[Powell] wants her arrested, so she's being arrested." *Id.* ¶ 93. That Love was standing in an area open to the public without posing an immediately evident danger was another reason (not by itself, but given the other circumstances) why the officers should not have relied solely on Powell's complaint. *See Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 913 (N.D. Ill. 2010) (detective should have been skeptical of witness testimony on account of her conflict with alleged trespasser and because the low gravity of alleged crime, among other factors, did not push for an immediate arrest) (citing *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 625 (7th Cir. 2010)).

The suggestion here is not that these officers needed to carry out a full-blown investigation into whether Love had permission to be on the lot; indeed, not much additional effort at clarification might have sufficed to defeat this claim (and the entire case) as a matter of law. *See, e.g., Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) (officers relied not only on complaint by owner of a Wendy's but proceeded to observe defendant in parking lot and interact with her and ask her to leave, at which point they had probable cause to arrest for criminal trespass). To be clear, discovery may well unearth a factual dispute as to whether such minimal efforts were made, or discovery might sufficiently fill in the gaps in terms of what Powell told the officers to allow Defendants to clear the admittedly low threshold of probable cause. For now, however, the false arrest (and false imprisonment) claims stemming from November 2007 survive.

## B. Malicious Prosecution

Love also raises claims under § 1983 arising out of the 2001 and 2007 incidents, on the related theory of malicious prosecution. Third Am. Compl. at Count 4. The Seventh Circuit has held that a plaintiff may not maintain an action under § 1983 for malicious prosecution under the due process clause where the state provides (as Illinois does) a state-law claim for that injury. *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003) (citing *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001)). This claim is therefore dismissed.

But the analysis does not end there. As with her false arrest and imprisonment claims, although she does not explicitly brand her malicious prosecution claim as such in the complaint, the Court must once again construe it liberally to raise a state-law claim in addition to a federal one. After all, it is "the opportunity for state-law remedies for wrongful-prosecution claims" that "precludes any constitutional theory of the tort" in the first place. *Smith*, 321 F.3d at 684. Love surely meant to pursue the cause of action on some viable theory, and indeed invokes the Court's supplemental jurisdiction in her response brief. Pl.'s Resp. to City Defs. Br. at 5.

Once again, the 2001 arrest is too far in the past to give rise to such a claim, 735 ILCS 5/13-202 (two-year limitations period for malicious prosecution claims), but the 2007 prosecution does not face that burden. It must be tested on its merits. "In order to prevail on a claim of malicious prosecution under Illinois law, the plaintiff must establish: (1) the commencement or continuance of an original

21

criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) malice; and (5) damages." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 265 (Ill. App. Ct. 2002) (citing *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). As against Powell, Fisher, Houston, and Davis, Love has stated a plausible claim to relief on these elements. There is no doubt that these Defendants commenced or proceeded criminal proceedings against her and that, as Love presents it, the charges were not pursued by the prosecution. *See Swick*, 662 N.E.2d at 1242 ("[A] malicious prosecution action cannot be predicated on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused."). As discussed above, she has pled a conceivable absence of probable cause. Finally, the pleadings state that Defendants acted with malice and caused damages. Accordingly, the Illinois common-law claim for malicious prosecution against Powell, Fisher, Houston, and Davis for the 2007 auto-pound incident may proceed.

### C. Conspiracy

Love asserts four conspiracy counts: (1) conspiracy to suppress her First Amendment rights under § 1983, (2) conspiracy to deny her Fourteenth Amendment right to equal protection § 1983, (3) conspiracy to interfere with her civil rights in violation of § 1985(3), and (4) failure to prevent the civil-rights conspiracy in violation of § 1986. Third Am. Compl. at Counts 6-9. Only the specific claim related to November 2007 is viable.

### 1. § 1983 Claims

"[T]o establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate that: (1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012) (quoting *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007)) (internal quotation marks omitted). At the pleadings stage, "a bare allegation of conspiracy" does not suffice, nor the "mere suspicion that persons adverse to the plaintiff had joined a conspiracy against him or her[.]" *Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009) (citations omitted) (noting that even before heightened pleading standards set by *Twombly* and *Iqbal*, "conspiracy allegations were often held to a higher standard than other allegations"). In particular, a plaintiff must specify "the parties, the general purpose, and the approximate date of the conspiracy." *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006) (citations omitted).

To the extent that she alleges an overarching conspiracy by *all* of the named individual Defendants together, Love clearly does not satisfy this standard. In essence, Love asserts that a wide-ranging network of individuals working at both OEMC and the CPD acted in concert for more than a decade to orchestrate isolated but supposedly coordinated incidents to prevent her from speaking out about her bad experiences with both agencies. These include the 2001 restaurant arrest (although it was Love herself who requested CPD intervention), the 2007 arrest of

her brother six years later (where she was not present), followed in short order by the auto-pound arrest, and a final incident, the late night search in 2013, four years after she filed this suit. What she does not assert is any factual detail whatsoever about the "form and scope of the conspiracy," nary a hint or "indication of when an agreement between [the] defendants was formed, what its terms were," and what the agreed-upon roles of the various players were. *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (citations omitted).

Yes, conspiracies are by nature secretive and (if they are any good) difficult to identify with precision. But here there is no allegation that the individual Defendants, aside from the subgroups of CPD officers who interacted with Love together, even knew each other, let alone any allegations about the circumstances of how and when they banded together to conceive then advance such a protracted scheme. Even at the pleadings stage a plaintiff, even *pro se* ones, must allege something to give, first, the defendant "a pretty concrete idea of what he has to defend against" and, second, the court a sense, "at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit." *Id.* Love gives *nothing*, only a "bare claim of conspiracy, wholly uninformative" to Defendants and to the Court. *Loubser*, 440 F.3d at 443 (7th Cir. 2006). The claims of a decade-long conspiracy by various City agents to violate her First and Fourteenth Amendment rights are dismissed.

Once again, however, the November 2007 incident stands apart. Focused concretely on the events of that day in the auto pound, which is within the

limitations period,[12] the bare minimum of a § 1983 conspiracy claim can be made out. Love's complaint alleges that CPD officers arrived and ignored her yet conferred with Powell, evidently colluding on the spot to bring false charges against her, after which she was taken into custody. Thus, the parties involved, how they are connected, the general purpose of the agreement, even the precise time and location it came together are all stated, in contrast to Love's speculative, decade-long, citywide conspiracy theory. *See, e.g., Gardunio v. Town of Cicero*, 674 F. Supp. 2d 976, 986 (N.D. Ill. 2009) (denying motion to dismiss conspiracy claim based on agreement to falsely arrest plaintiff). It will be Love's ultimate burden to prove that this is what actually transpired, of course, and discovery might reveal facts that sink the claim, but a claim based on such a narrowly-defined conspiracy (and only this specific conspiracy) may proceed.

### 2. §§ 1985 and 1986 Claims

Claims under §§ 1985 and 1986 are inapplicable on the basis of Love's allegations. A claim under § 1985(3) requires four elements: "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." *Green v. Benden*, 281 F.3d 661 (7th Cir. 2002) (citing *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir.1999)). Importantly, § 1985(3), originally known as the Ku

---

[12]Whether a conspiracy claim is timely is based on the "timeliness analysis used to address the accrual of each of the constitutional violations that make up the conspiracy." *Hobley v. Burge*, 2004 WL 1243929, at *8 (N.D. Ill. June 3, 2004) (citing *Newsome v. James*, 968 F. Supp. 1318, 1325 (N.D. Ill. 1997)). Here, as explained above, those violations of the Fourth Amendment satisfy the two-year limitations period.

Klux Klan Act, does not "apply to all tortious, conspiratorial interferences with the rights of others." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Instead, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*; *accord Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996). Section 1986, meanwhile, makes liable those who, "having knowledge that any of the wrongs conspired to be done [under § 1985] are about to be committed," neglect or refuse to prevent them. 42 U.S.C. § 1986.

Love does not allege, in any fashion, the existence of racial or otherwise class-based discriminatory animus on the part of the Defendants—the alleged driving force was retaliation for her complaints, not her membership in a protected class. In any event, the same shortcomings in terms of the bare, conclusory nature of her other conspiracy allegations apply to her § 1985(3) claim as well. *See Copeland v. Northwestern Memorial Hospital*, 964 F. Supp. 1225, 1235 (N.D. Ill. 1997) ("It is not enough for a section 1985 plaintiff to plead mere conclusory allegations of a conspiracy. Rather, the plaintiff must plead specific material facts that show the existence of a conspiracy.") (citing *Winterland Concessions Co. v. Trela*, 735 F.2d 257, 262 (7th Cir. 1984)). Accordingly, Love's § 1985(3) claim and along with it her § 1986 claim, which is necessarily tied to the existence of a plausible § 1985(3) conspiracy, must fail.

**D. *Monell* Claim**

To round out her § 1983 claims, Love brings suit against the City under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Third Am. Compl. at Count 5. A municipality can be held liable for constitutional deprivations under *Monell* if the plaintiff can establish: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009) (quoting *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)). Love fails to state any of these things.

Although Love levies a host of different instances in which she was allegedly harmed by the City's agents (not just the arrests and searches discussed, but other perceived indignities), the length and diversity of this list alone is not enough to identify, with requisite specificity, an express policy, a customary practice, or a policymaker deliberately taking aim at Love. "To state a *Monell* claim against the City," Love "was required to plead factual content that allows the court to draw the reasonable inference that the City maintained a policy, custom, or practice," and that "plausibly suggest[s] … entitlement to relief." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citations omitted). Instead, Love merely declares, without anything more in support, that the City must have engaged in the requisite "policies and practices" because CPD officers "believe they will not be punished for

what they do in violation of a citizen's rights." Pl.'s Resp. to City Defs. Br. at 5. Conclusory allegations of municipal policy and practices, unsupported by factual pleadings, will not suffice. *See, e.g., White v. City of Chicago*, 2014 WL 958714, at *3 (N.D. Ill. Mar. 12, 2014); *Copeland v. Nw. Mem'l Hosp.*, 964 F. Supp. 1225, 1240 (N.D. Ill. 1997). The *Monell* claim against the City is dismissed.

### E. Retaliation

The complaint raises an action for retaliation, ostensibly under 42 U.S.C. § 12203. Third Am. Compl. at Count 10. Love acknowledges that this statutory provision, which falls under the Americans with Disabilities Act, was mistakenly cited. Pl.'s Resp. to City Defs. Br. at 6. Indeed, the complaint makes no mention of Love having a disability. It does however invoke the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, and its protections for "employees who collectively complain about terms or conditions of their employment." Third Am. Compl. ¶ 310. But, aside from the fact that the pleadings do not allege any kind of collective action by OEMC employees (the only complainant was Love), the NLRA does not provide for a private cause of action in federal district court. *See* Benjamin Sachs, *Employment Law as Labor Law*, 29 Cardozo L. Rev. 2685, 2694-96 (2008) (NLRA protects rights to act collectively and concentrates enforcement in administrative mechanism, not individual); *see also 520 S. Michigan Ave. Associates, Ltd. v. Shannon*, 549 F.3d 1119, 1137 (7th Cir. 2008) (finding state law creating private cause of action for retaliation preempted by NLRA). Thus to the extent Love raises a retaliation claim under the NLRA, it is also dismissed.

## F. Defamation and Public Disclosure of Private Facts

The remaining claims all arise under Illinois common law, and none (with the exception of the indemnification count) are adequately pled. To start, Love alleges that Officers Fisher and Houston defamed her and made a public disclosure of a private fact when they announced to her mother and to Henderson at the police station following her November 2007 arrest that she had been previously arrested.[13] Neither theory is tenable. Third Am. Compl. at Count 3. To win on a defamation claim, a plaintiff "must show that the defendant made a false statement about her; that the defendant caused an unprivileged publication of the statement to a third party; and that the publication of the statement harmed her." *Knafel v. Chicago Sun-Times, Inc.*, 413 F.3d 637, 639 (7th Cir. 2005) (citing *Parker v. House O'Lite Corp.*, 756 N.E.2d 286, 291-92 (Ill. App. Ct. 2001)). Because Love does not contest that she had, in fact, been previously arrested, so her defamation claim is not based on a false statement and is thus not viable.

Next, "[a] successful cause of action for the public disclosure of private facts requires the plaintiff to prove that: (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person." *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 676-77 (Ill. App. Ct. 2000) (citations omitted). Leaving aside the question raised by the third element, whether the disclosure of a past arrest is highly offensive to a reasonable person, Love cannot meet the first two

---

[13]Love cites a federal statute, 28 U.S.C. § 4101, which deals with defamation in the context of foreign judgments, so it is inapplicable.

requirements of this cause of action. First, the breach of privacy associated with this tort is not triggered by communicating a fact merely "to a single person or even to a small group of persons." *Miller v. Motorola, Inc.*, 560 N.E.2d 900, 903 (Ill. App. Ct. 1990) (quoting Restatement (Second) of Torts § 652D, comment a, at 384-85 (1977)). Love only alleges that her arrest was revealed to her mother and to Henderson, when publication to a larger audience is required for an actionable claim. Second, it is not clear that a prior arrest can qualify as a private, rather than public, fact. *See Oden v. Cahill*, 398 N.E.2d 1061, 1064 (Ill. App. Ct. 1979) (arrest records, even when expunged, are "already within the realm of public knowledge"). Accordingly, Love does not state a plausible claim for public disclosure of a private fact.

## G. Wrongful Termination/Retaliatory Discharge

Love next alleges that the City and the OEMC Defendants (recall, however, that only Fahey has been served) wrongfully terminated her in retaliation, in 2001. Third Am. Compl. at Count 11. This cause of action is untimely. In Illinois, a retaliatory discharge is considered a tort and, when brought against a municipality, is subject to a one-year statute of limitations. *Padilla v. Cnty. of Cook*, 100 F. Supp. 2d 1145, 1147 (N.D. Ill. 2000) (citing *Halleck v. County of Cook*, 637 N.E.2d 1110, 1112-13 (Ill. App. Ct. 1994)). The earliest that Love raised this cause of action was in her second amended complaint, filed in 2014, thirteen years too late. *See* R. 250, Sec. Am. Compl. Love does not try to argue otherwise. *See* Pl.'s Resp. to City Defs. Br. Any claim for wrongful termination/retaliatory discharge is dismissed.

## H. Breach of Contract

The contractual claim against the City, Third Am. Compl. at Count 12, is similarly time-barred. As best as the Court can tell, this claim is premised on Love's termination from employment with OEMC. Notwithstanding the question of whether Love actually pleads facts showing the existence of a contract and its breach (most employment is at-will), the discharge occurred in 2001. Under Illinois law, breach-of-contract claims are subject to limitations periods of either ten years, in the case of written agreements, 735 ILCS 5/13-206, or five years, in the case of unwritten ones, 735 ILCS 5/13-205. Love first raised her contract claim in 2014, which was too late whether the contract was written or oral. The contract claim is dismissed.

## I. Intentional Infliction of Emotional Distress

The cause of action for intentional infliction of emotional distress, Third Am. Compl. at Count 13, also fails. To begin, the statute of limitations on emotional-distress claims in Illinois is two years. *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 923 (N.D. Ill. 2007) (citing 735 ILCS 5/13-202). The events in the early 2000s, involving Love's work at OEMC and the restaurant arrest, are too far in the past to be timely.

As for the other events cited in the complaint, none meet the high threshold for successful emotional-distress claims under Illinois law, which requires a plaintiff to allege that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would … and (3) the defendant's conduct in fact caused severe emotional distress." *Cook v. Winfrey*, 141 F.3d 322, 330 (7th Cir. 1998) (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994)). The alleged conduct of the Defendants, during Grooms' arrest (where Love was not even present), the incident at the auto pound and Love's later detention, and the home-search in 2013, does not rise to the level of extreme and outrageous. It is true that "[e]xtreme and outrageous conduct may be the result of an abuse of a position of power," and "police officers who abuse their authority may be liable" on this basis. *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 970 (N.D. Ill. 1999) (citations omitted). Even so, it is not enough that "the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress"; instead, his conduct must be "so outrageous in character, and so extreme

in degree, as to go beyond all possible bounds of human decency." *Pub. Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976); *accord Oates v. Discovery Zone*, 116 F.3d 1161, 1174 (7th Cir. 1997) ("Mere insults, indignities, threats, annoyances, petty oppressions or trivialities" are insufficient.) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). Love does not allege behavior of the right sort. She asserts that some of the Defendants falsely arrested her at the auto impound lot, defamed her and improperly added charges against her later at the station, and conducted a nighttime search based on an apparently mistaken tip. Although these are all causes for indignity to be sure, without more, she fails to elevate these independently actionable torts onto the separate plane of intolerable conduct beyond all bounds of human decency. *See*, *e.g.*, *Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998) (summarizing Illinois cases holding that allegations amounting to mere defamation are not grounds for emotional-distress claim); *Holder*, 39 F. Supp. 2d at 969-70 (officers' filing false criminal charges can underpin emotional-distress claim where they repeatedly uttered profane and racial slurs at plaintiff); *Lorenzana v. Mette*, 1995 WL 461860, at *6 (N.D. Ill. Aug. 2, 1995) (plaintiff who was kicked, beaten, racially insulted by police while held in custody for seven hours stated viable emotional-distress claim). As such, Love's claims for emotional-distress must be dismissed.

## J. Indemnification

Love seeks indemnification from the City for any damages caused by its employees named as individual Defendants. Third Am. Compl. at Count 14. Under

745 ILCS 10/9-102, municipalities like Chicago are liable for any tort judgments entered against their employees acting, at the time of the injury, within their scope of employment. *See Argento v. Village of Melrose Park*, 838 F.2d 1483, 1484 (7th Cir. 1988). Because the claims against Fisher, Houston, and Davis arising out of the November 2007 arrest remain in play, dismissing this cause of action would be premature. *Cf. Wilson v. City of Chicago*, 120 F.3d 681, 684-85 (7th Cir. 1997) (no benefit to forcing plaintiff to wait until final judgment is entered before bringing indemnification claim). To the extent that the City could be liable to indemnify these specific Defendants, this count remains in place.

## K. *Respondeat Superior*

Finally, Love seeks to hold United Road Towing liable under the doctrine of *respondeat superior* for the allegedly unlawful actions of its employee, Powell, in November 2007. Third Am. Compl. at Count 15. But Love cannot hold the company liable for the surviving federal claims, as "[r]espondeat superior liability does not apply to private corporations under § 1983." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014) ("[A] private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.") (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).[14] Love can only seek to hold United Road Towing vicariously liable, therefore, for the state-law claims still facing Powell, *i.e.*, false imprisonment, false arrest, and malicious prosecution.

---

[14]In *Shields*, while it applied the rule, the Seventh Circuit questioned the wisdom, and invited future review, of exempting corporations from ordinary vicarious-liability standards while holding them to a *Monell* analysis of whether they enforce unconstitutional policies and customs.

For Illinois claims, "[u]nder the theory of respondeat superior, an employer can be liable for the tort of an employee, but only for those torts that are committed within the scope of employment." *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007). On the face of the operative complaint, it could be reasonably inferred that Powell was acting in the scope of employment during the events of November 2007. He was United Road Towing's agent in managing and overseeing operations in the auto pound lot, and it was in carrying out these duties that he interacted with and sought to dispose of Love. It matters not, however, because Love did not sue United Road Towing in time.[15]

The applicable statute of limitations for the various state claims here, as discussed, is two-years. *See* 735 ILCS 5/13-202. Although the underlying events occurred in November 2007, United Road Towing was not named as a Defendant until November 2014. *See* Third Am. Compl. Love argues, however, that the limitations period should be equitably tolled. R. 370, Pl.'s Resp. to United Road Towing Br. at 3-4. This contention is without merit. "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information" allowing her to bring suit. *Smith v. City of Chicago Heights*, 951 F.2d 834, 839 (7th Cir. 1992) (citation and internal quotation marks omitted); *but see Shropshear v. Corp. Counsel of City of Chicago*, 275 F.3d 593, 596 (7th Cir. 2001) (mentioning uncertainty as to whether doctrine "even exists in Illinois"). According to Love, she returned to the auto pound days after her arrest

---

[15]Love does not make an argument that the amendments made to her complaint in November 2014 should relate back to the date of her original pleadings in 2009. *See* Fed. R. Civ. P. 15(c)(1).

and spoke with a supervisor, who told Love that the name of Powell's employer was United Road Services. Love relied on that one representation to sue the misnomer-company. That is the extent of her efforts to identify the proper defendant, which the Court cannot say constitutes the efforts of a duly diligent person. *See Athmer v. C.E.I. Equip. Co. Inc.*, 121 F.3d 294, 295-96 (7th Cir. 1997) (plaintiff not entitled to delay suit where he thought defendant corporation's name was "C.E.I. Pacer" instead of the actual "C.E.I. Equipment" and did not take steps to uncover real name, despite its obscurity and refusal of his employer to reveal it).

Illinois courts have also stated that "[a] limitations period may be equitably tolled 'if the defendant has actively misled the plaintiff, or if the plaintiff has been prevented from asserting his or her rights in some extraordinary way[.]'" *Thede v. Kapsas*, 897 N.E.2d 345, 351 (Ill. App. Ct. 2008) (quoting *Clay v. Kuhl*, 727 N.E.2d 217, 223 (Ill. 2000)). Despite Love's characterization, her reliance on the supervisor's statement does not fall into one of these categories. The sole allegation is that the supervisor said "United Road Services" instead of "United Road Towing"; that alone by an unnamed supervisor does not evince an effort to actively or intentionally divert Love from asserting her rights.

In this vein, Love invokes 735 ILCS 5/13-215, which states that a plaintiff may commence any action with five years, notwithstanding the ordinary limitations period, where the allegedly liable party has concealed the cause of such action. Pl.'s Resp. to United Road Towing Br. at 3. Love misunderstands the intended purpose of this provision. "The concealment contemplated by section 13-215 must consist of

affirmative acts or representations calculated to lull or induce a claimant into *delaying filing* of his or her claim, or to *prevent a claimant from discovering* a claim." *Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1009 (Ill. 2007) (emphasis added). The fraudulent concealment provision concerns efforts to hide the *very existence* of an actionable injury. Even putting aside the possibility that the supervisor simply misspoke or himself only knew the approximate corporate name of the company, the misunderstanding this caused was only related to the precise name of one defendant, not whether and when Love filed her action.

In sum, there exist no grounds to equitably toll or otherwise evade the statute-of-limitations problem facing Love's claim against United Road Towing. The *respondeat superior* claim is therefore dismissed.

## IV. Conclusion

To sum up, Defendants' motions to dismiss are granted in large part, with the effect of trimming the scope of this case considerably. The only remaining claims are: (1) violation of the Fourth Amendment, asserted under § 1983 against Powell, Fisher, Houston, and Davis for the November 2007 arrest and detention; (2) conspiracy under § 1983 against the same four individuals for the November 2007 events; (3) false imprisonment, false arrest, and malicious prosecution claims under Illinois common law against the same four individuals for the November 2007 events; and, (4) indemnification against the City for any potential liability for damages by the City employees named in these claims. Discovery must be limited

those claims related to Love's arrest on November 2007 at the City auto pound and the ensuing imprisonment. All other claims and Defendants are dismissed.

ENTERED:


s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: May 7, 2015